UNITED STATES, Appellee,

v.

Donald T. KING, Private, U.S. Army, Appellant.

No. 61,869.
CM 447533.

U.S. Court of Military Appeals.

April 12, 1990.

For Appellant: *Captain W. Renn Gade* (argued); *Colonel John T. Edwards, Lieutenant Colonel Russell S. Estey, Captain Keith W. Sickendick* (on brief); *Captain Wayne D. Lambert.*

For Appellee: *Captain Karen V. Johnson* (argued); *Colonel Alfred F. Arquilla, Lieutenant Colonel Daniel J. Dell'Orto, Captain Martin D. Carpenter* (on brief); *Lieutenant Colonel Gary F. Roberson.*

*Opinion of the Court*

COX, Judge:

Appellant pleaded guilty to a single specification of murder while attempting to commit rape, in violation of Article 118, Uniform Code of Military Justice, 10 USC § 918.[1] The military judge, sitting alone as

---

1. Appellant entered a conditional plea under RCM 910(a)(2). That rule provides: With the approval of the military judge and the consent of the Government, an accused may enter a conditional plea of guilty, reserving in writing the right, on further review or appeal, to review of the adverse determination of any specified pretrial motion. If the accused prevails on fur-

a general court-martial at Fort Huachuca, Arizona, sentenced appellant to a dishonorable discharge, confinement for life, and total forfeitures. Pursuant to a pretrial agreement, the convening authority reduced the confinement to 15 years, but approved the rest of the sentence. The Court of Military Review affirmed. 27 MJ 664 (1988). We granted three issues for review:

## I

WHETHER THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO DISMISS FOR LACK OF A SPEEDY TRIAL.

## II

WHETHER APPELLANT'S GUILTY PLEA WAS IMPROVIDENT BECAUSE OF THE GOVERNMENT'S MISCONDUCT AND DEFENSE COUNSEL'S INEFFECTIVE ASSISTANCE PRIOR TO APPELLANT'S PLEA.

## III

WHETHER APPELLANT WAS DENIED THE EFFECTIVE ASSISTANCE OF COUNSEL.

We hold that appellant was not denied a speedy trial, that he was not denied effective assistance of trial defense counsel, and that his pleas of guilty were provident.

The deceased, Private Annette Wozniak, vanished at Fort Huachuca, Arizona, on or about October 22, 1983. Her body was found on base on November 8, 1983. Appellant and Wozniak were members of the same advanced individual training class. Another servicemember was the early suspect. Training ended shortly after Private Wozniak's disappearance, and the class was dispersed worldwide. Appellant was assigned to Germany.

According to evidence adduced at an Article 32, UCMJ, 10 USC § 832, investigation (there were two), appellant allegedly told a servicemember on February 5, 1984, "that he was going to hell for murder." Earlier, he had supposedly told another servicemember that he killed "a girl." Reports of these statements led investigators to appellant. Later, on April 30, 1984, Private Edward Bahr claimed that appellant told him he had killed Wozniak.[2]

On or about February 9, 1984, appellant sought legal counsel in Germany. He had already been questioned by Criminal Investigation Command (CID) agents, but he had not confessed. It was stipulated at trial that a Trial Defense Service attorney, Captain John Hoffman, saw appellant for about 5 minutes. Hoffman refused to enter into an attorney-client relationship. This was done so that Hoffman would not be called to Fort Huachuca as individual military counsel. Hoffman basically told appellant "not to talk to anyone about the case" and "to tell anyone that tried to question him to call me [Hoffman]." Hoffman declined to discuss the facts of the case with appellant. It was appellant's pla-

---

ther review or appeal, the accused shall be allowed to withdraw the plea of guilty. The Secretary concerned may prescribe who may consent for the Government; unless otherwise prescribed by the Secretary concerned, the trial counsel may consent on behalf of the Government.

Appellant's offer to plead guilty was specifically conditioned on the Government's, convening authority's, and the military judge's agreement that the Motion to Dismiss for denial of my right to speedy trial, previously made and denied herein, is preserved for further review on appeal and said appeal is not barred by a subsequent acceptance by the Court of my plea of guilty as, as [sic] provided for in R.C.M. 910(a)(2).

**2.** Regarding these statements to third parties, which were not introduced at the court-martial, the military judge made the following observations in conjunction with the speedy-trial motion:

I am convinced that the preferral of charges against the accused on 7 August 1984 was precipitated by his making a statement to the CID on 4 August 1984. This was the first real "breakthrough" in the investigation. The subsequent Article 32 revealed how questionable the earlier "admissions" were, because of the doubtful credibility of those witnesses who were involved. (The witness Bahr was incredible, for instance.)

toon leader who informed the investigators that King had spoken with an attorney who advised him not to talk to the agents.

Appellant, still in Germany, was not reinterviewed until May 10, 1984. By this time he was "titled" as a suspect. Again without making any admissions, *he terminated this interview by requesting counsel.* It was stipulated in court that another Trial Defense Service lawyer, Captain Mark Frye, was thereupon produced. Frye also refused to enter into an attorney-client relationship, on advice from his Regional Defense Counsel, to avoid temporary duty at Fort Huachuca.[3] Frye also advised appellant to remain silent, and Frye refused to discuss the facts of the case with him.[4]

On that same day, May 10, 1984, appellant was formally restricted to the area of his kaserne, except when escorted by a noncommissioned officer. An impasse between convening authorities then developed. The commander in Germany allegedly refused to try appellant since the events had occurred at Fort Huachuca. The commander at Fort Huachuca allegedly refused to accept assignment of appellant unless he was charged. Sometime in July 1984, the commander of Fort Huachuca agreed to take jurisdiction. CID agents from Fort Huachuca went to Germany on July 31, 1984, and brought appellant back—in custody—on August 3, 1984. At

Fort Huachuca, appellant was placed in pretrial confinement, where he remained until trial on March 25, 1985.

On August 4, 1984, appellant was interviewed at Fort Huachuca without notice to any counsel. The investigator knew appellant had terminated the prior interview by requesting counsel, and he knew appellant did not have a lawyer. At this interview, appellant waived counsel and confessed; ultimately, he signed a written statement. On August 7, 1984, charges were preferred, *and appellant was finally appointed counsel.*

*Speedy Trial*

Both the military judge and the Court of Military Review proceeded on the basis that RCM 707(d), Manual for Courts-Martial, United States, 1984, provided an applicable standard for speedy-trial analysis.[5] Before this Court, both on brief and in oral argument, appellant and the Government agree that RCM 707(d) is applicable to these facts. At the date of trial, RCM 707(d) stated:

(d) *Arrest or confinement.* When the accused is in pretrial arrest or confinement under R.C.M. 304 or 305, immediate steps shall be taken to bring the accused to trial. No accused shall be held in pretrial arrest or confinement in excess of 90 days for the same or related

---

3. As shocking as this position may seem, we would be remiss in not acknowledging our own contribution to it. In the past, we have frequently implied that an attorney-client relationship, once formed, is virtually indestructible unless the accused himself wishes to terminate it. *E.g., United States v. Clark,* 11 MJ 70 (CMA 1981); *United States v. Iverson,* 5 MJ 440 (CMA 1978); *United States v. Eason,* 21 USCMA 335, 45 CMR 109 (1972). The implication in this context would be that, once an attorney commences a professional relationship with a service-member, the attorney must abandon all his other clients and follow that one service-member around the world. The circumstances of this case suggest that such language may be overbroad in this respect. However, appellant's "right" to the services of Captain Hoffman or Captain Frye was not an issue in this case. We will await more germane facts to revisit this question.

4. The complete stipulation of Captain Frye's expected testimony is contained in the Appendix.

5. The military judge also considered, and rejected, trial defense counsel's arguments based on Article 10, Uniform Code of Military Justice, 10 USC § 810, and *United States v. Burton,* 21 USCMA 112, 44 CMR 166 (1971). Article 10 provides that

[w]hen any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss the charges and release him.

*Burton,* as modified by *United States v. Driver,* 23 USCMA 243, 246, 49 CMR 376, 379 (1974), created "a presumption of an Article 10 violation" after 90 days of pretrial confinement chargeable to the Government. The Court of Military Review limited its review to RCM 707. Article 10 establishes a more rigorous speedy-trial standard than does the Sixth Amendment to the Constitution. *United States v. Powell,* 2 MJ 6 (CMA 1976); *United States v. Marshall,* 22 USCMA 431, 47 CMR 409 (CMA 1973).

charges. Except for any periods under subsection (c)(7) of this rule, the periods described in subsection (c) of this rule shall be excluded for the purpose of computing when 90 days has run. The military judge may, upon a showing of extraordinary circumstances, extend the period by 10 days.

Thus, under the language of the rule, the maximum amount of delay that could be attributed to the Government without denying an accused a speedy trial is 100 days. The drastic and only remedy prescribed for violations of the rule is dismissal of the charges. RCM 707(e). *But cf.* 18 USC § 3162(a) (judge has option to dismiss case with or without prejudice).

■■ August 1, 1984, happened to be the effective date of the 1984 Manual, *supra.* Exec. Order No. 12,473, 49 Fed.Reg 17152 (1984). Appellant's restriction in Germany commenced on May 10, 1984, and extended past August 1.[6] On August 3, 1984, CID agents flew appellant to Fort Huachuca. At trial, the parties stipulated to a chronology, a portion of which includes:

01 Aug 84—New MCM in effect

03 Aug 84—King in custody of CID, FRG; pretrial confinement starts

07 Aug 84—Charge preferred; CPT De-Fonte appointed IO, 32(b)

The military judge ruled that appellant's restriction to the kaserne was not tantamount to confinement; hence, speedy-trial accountability did not begin on May 10 under the old rules. *See United States v.*

*Schilf,* 1 MJ 251 (CMA 1976). The defense argued that the conditions on appellant's liberty increased significantly as of August 1, after the CID agents from Fort Huachuca arrived in Germany. Therefore, the defense contended, RCM 707(d) accountability commenced on August 1. The prosecution argued that custody did not occur until August 3, the date the agents actually took appellant into custody for the flight to Arizona. Apparently to avoid having to call witnesses from Germany to Fort Huachuca for resolution of the period of August 1–3, it was agreed that the clock began to run on August 1.

After exclusions (RCM 707(c)), the judge calculated 103 days of delay chargeable to the prosecution. Under the circumstances of the case, however, he concluded that the delay did not amount to a deprivation of speedy trial. He reasoned that the Rules for Courts–Martial certainly "raise[d] a red flag," but "there is no magic in the expiration of these landmark periods when one is attempting to determine whether an accused has received a speedy trial."

The Court of Military Review concluded "that pretrial confinement commenced *on 4 August 1984,* the date appellant was returned to Fort Huachuca, Arizona." 27 MJ at 671 (emphasis added). Thus, in its view, the Government delay was exactly 100 days and within RCM 707(d), since the military judge found the requisite extraordinary circumstances justifying the additional 10 days' delay.

This conclusion raises two problems: First, the Court of Military Review was not in a position to consider the testimony of

---

6. RCM 707(a), in effect at the time of appellant's trial, states the "general" rule as follows:

The accused shall be brought to trial within 120 days after notice to the accused of preferral of charges under R.C.M. 308 or the imposition of restraint under R.C.M. 304, whichever is earlier.

Imposition of restraint, as set forth in RCM 304—which became effective on August 1, 1984 —included "[c]onditions on liberty"; "[r]estriction in lieu of arrest"; "[a]rrest"; and pretrial "[c]onfinement." [Effective March 1, 1986—after appellant's trial—RCM 707(a)(2) was added to modify the rule by eliminating "conditions on liberty" as a speedy-trial triggering event.] Unquestionably, appellant's restriction to the ka-

serne on May 10, 1984, constituted "conditions on liberty" at a minimum. Appellant contends that RCM 707(a) also applies to this case and that the triggering event for the 120-day rule was May 10. However, this date was 82 days before the effective date of the Rules for Courts–Martial. In *United States v. Leonard,* 21 MJ 67 (CMA 1985), we concluded that, when the triggering event occurred before the effective date of the rule, the rule did not apply. Therefore, as in *Leonard,* RCM 707(a) *did not apply to* appellant's restriction to the kaserne. However, in RCM 707(d), *see* text at 62, the triggering event is arrest or confinement. That occurred in the instant case on or after August 1, 1984. Therefore, we agree with the courts below that RCM 707(d) applied to appellant's case.

the potential witnesses from Germany regarding the conditions of restraint as of August 1—the apparent basis for the trial agreement to start the clock on that date. Second, *nobody* ever contended that confinement was not fully operable by August 3, when the CID agents took appellant into custody and removed him to Arizona. Though we can detect no basis for its conclusion that pretrial confinement commenced on August 4, it is not necessary for us to resolve this inception-date dispute because we hold, as a matter of law, that considerably more of the pretrial delay should have been attributed to the defense than the judge did.

■ Before this Court, appellant contends that certain of the RCM 707(c) exclusions should not have been charged to the defense because the prosecution was not in a position to proceed at the time. That argument was rejected in *United States v. Longhofer*, 29 MJ 22 (CMA 1989). The Government counters that other RCM 707(c) events should have been excluded by the military judge but were not. We agree.

We will assume, along with the military judge, that the triggering event—pretrial arrest or confinement—commenced on August 1, 1984. Accountability terminated on March 25, 1985, the date appellant entered his pleas—a total of 236 days. *See* RCM 707(b)(3)(A). Between these two dates, the following events occurred:

After the first Article 32 investigation was completed, the defense requested that the convening authority delay his decision whether to refer the case to a court-martial for 5 days to allow defense counsel an opportunity to discuss the case with the convening authority and to provide the convening authority with the benefit of his objections to the investigating officer's report. The defense specifically accepted responsibility for this 5-day delay, from September 27 to October 1, 1984, and the trial judge properly charged the defense with those days. *See* RCM 707(c)(3).

■ On October 9, 1984, the defense requested a psychiatric evaluation of appellant. This request was granted, and the Army provided a forensic psychiatrist from another location. A partial report was prepared on November 9, 1984, and the final report was submitted on December 4, 1984, after the results of clinical psychological testing became available. The military judge properly charged all of this time—a total of 56 days—to the defense. *See* RCM 707(c)(1)(A) and (B).

On December 4, 1984, an informal conference concerning scheduling was held with counsel and the military judge. The judge indicated a desire to proceed to trial before Christmas, and the date December 20, 1984, was "informally" set. As noted by the judge, defense counsel indicated at the conference that he was "a long way from being ready to go to trial and that, after a date for motions was set, he would require a delay between the motions session and the trial itself." On December 4, trial counsel submitted a "docket sheet" to defense counsel, proposing a trial date of December 20. On December 6, 1984, the document was returned to trial counsel requesting a delay until January 7, 1985.

On January 7, defense counsel requested further delay to February 4, 1985, for a first session on motions. Defense counsel further "indicated that the actual trial could not proceed until mid-March because of the preparation time he would require." On February 4, the military judge arrived at Fort Huachuca. The parties agreed to proceed on the next day, February 5. The motions were heard on February 5 and 6. The military judge excused the Government from accountability for December 20, 1984, to February 4, 1985, as a "period of delay resulting from a delay in a proceeding or a continuance in the court-martial granted at the request or with the consent of the defense." RCM 707(c)(3). February 5–6 was excluded as a "session on pretrial motions." RCM 707(c)(1)(C). The total period excluded was 48 days.

■ In arriving at this sum, we hold that the judge improperly applied RCM 707(c)(3). On December 4, the defense agreed to the tentative trial date of December 20. It is clear that the defense did not want to proceed even on motions before

that time. The military judge should have charged this time to the defense under RCM 707(c)(3) as well. Since December 4 and 20 were already excluded from Government accountability, 15 more days should have been excluded.

On February 6, the military judge granted a defense motion for a new Article 32 investigation. A special court-martial judge was promptly made available to conduct the investigation. The defense immediately moved for a 7–day continuance to prepare for the investigation. This delay was granted and properly charged as defense time. The investigation commenced on February 20, and the hearings were completed on February 22. The Investigating Officer's report was submitted on February 23. During the period February 7–23, the judge only excluded the 7 days specifically requested by the defense, leaving the remaining 10 days chargeable to the Government. We hold that the military judge did not abuse his discretion in this respect.

On February 22, 1985, even before the Article 32 investigation report was submitted, the defense requested that the convening authority, Fort Huachuca, recuse himself

> because of the—the amount of attention that in context that had been had from the DA level, that we did believe that there was an issue about his ability to objectively determine it. And although we did state in the letter that we were confident that he would attempt to separate himself from these influences, that we reminded him that even if he felt he could do that—that we wanted—that he should be reminded to avoid the appearance of impropriety.

Basically, counsel conceded, he "wanted the trial moved."

The judge found that, "consistent with the desires of the defense, the Commander, U.S. Army Air Defense Artillery Center, Fort Bliss, Texas, assumed jurisdiction of the case." On February 27, 1985, he referred the charges to a general court-martial. Charges were served on appellant at Fort Huachuca, 2 days later on March 1, 1985. [We take judicial notice that there were 28 days in February 1985.] On March 1, trial counsel served a docket notice on defense counsel. This document was returned on March 4, along with a notice of further defense motions. The defense agreed to a March 8 session on motions. On March 8, defense counsel moved to dismiss for want of speedy trial. After a full hearing, this motion was denied. At the conclusion of the session, the defense requested a delay to March 25, the date pleas were entered.

Presumably, the military judge relieved the Government of accountability for the dates March 8–25, due to the hearing on the speedy-trial motion and the delay explicitly requested by the defense. RCM 707(c)(1)(C) and (c)(3). Apparently, the judge charged the Government with all the time from after the conclusion of the second Article 32 (February 24) to the day before the next hearing on motions (March 7). We hold that this entire period was excludable from government accountability.

When the defense requested that the Commander, Fort Huachuca, recuse himself and that a new convening authority assume jurisdiction, the ensuing days occasioned by this request—subject to reasonableness of duration—constituted a "period of delay resulting from a delay in a proceeding or a continuance in the court-martial granted *at the request* or with the consent of the defense." RCM 707(c)(3)(emphasis added). *See United States v. Longhofer*, 29 MJ at 27. From March 1, when the Government submitted the docket notice, to March 8, the date the defense agreed to, also constituted a "period of delay resulting from a delay in a proceeding or a continuance in the court-martial granted at the request or *with the consent* of the defense." RCM 707(c)(3) (emphasis added).

In sum, we calculate the following days chargeable to the Government: For the period August 1—October 8, 1984, all but 5 days, for a total of 63 days. Ten more days were added during the second Article 32 proceeding. The day appellant was

brought to trial is also chargeable to the Government. RCM 707(b)(1). The total number of days attributable to the Government is now 74.

As the military judge aptly observed:

At no time during the processing of this case did the defense submit a request for immediate trial. From 4 December 1984 forward, the defense posture as presented to the judge was not that of seeking an early trial date, but that due to the complexity and seriousness of the case, the number and location of all the witnesses, and the requirements of preparing a good, professional defense, they felt that a great deal of time would be required before they felt prepared for trial.

▮▮▮▮ There is no doubt that the right to speedy trial is an important right for servicemembers; and when that right has been violated, we have not hesitated to enforce it. *See Thomas v. Edington,* 26 MJ 95 (CMA 1988); *United States v. Carlisle,* 25 MJ 426 (CMA 1988). However, the right to speedy trial is a shield, not a sword. *Cf. United States v. Cherok,* 22 MJ 438, 440 (CMA 1986); *United States v. Burris,* 21 MJ 140, 144 (CMA 1985). An accused cannot be responsible for or agreeable to delay and then turn around and demand dismissal for that same delay. Like most rights, speedy trial can be waived; it was so here.

▮▮▮▮ Regarding the other theories of speedy trial, *see* n.5, *supra,* the very same

evidence of defense delay and waiver substantiate the military judge's rejection of them. In particular, his conclusion that the presumption of *United States v. Burton,* 21 USCMA 112, 44 CMR 166 (1971), was overcome is amply justified.[7] The issue is without merit.

### Effective Assistance of Counsel

▮▮▮▮ The final two issues relate to effective assistance of *trial defense counsel.* No one disputes that Trial Defense Service, Frankfurt, provided appellant with something less than effective assistance of counsel. *See United States v. King,* 27 MJ at 667–68.

The scenario may be briefly recounted: As a result of the Trial Defense Service lawyers' desire not to be drawn into an attorney-client relationship, appellant had no attorney as of August 4, 1985, when he confessed at Fort Huachuca. *See* n. 3, *supra.* Notwithstanding the fact that appellant had terminated his previous interrogation *by requesting counsel,* military investigators *reinitiated contact* with appellant and obtained a confession.

At trial, defense counsel's argument, in part, was that Mil.R.Evid. 305(e)[8] required the CID agent in Arizona to notify appellant's "counsel" prior to initiating interrogation. The military judge concluded that, since appellant had no counsel as of Au-

---

7. The *Burton–Driver* presumption, *see* n. 5, *supra,* has been applied in such a manner that the Government must "show *extraordinary* reasons for not complying" with the 90–day rule, and it must show a nexus between the extraordinary circumstances and a delay beyond 90 days. In other words, the Government must show that these abnormal circumstances *"required* more than" 90 days to get the case to trial. *United States v. Henderson,* 1 MJ 421, 423, 424 (CMA 1976). *See also United States v. Johnson,* 3 MJ 143, 149 (CMA 1977) ("In the absence of ... a causal nexus between the proffered factual circumstances and the delay, the former will not justify the latter.")

The circumstances of the instant case do not require us to evaluate the need for such court-made rules in light of RCM 707. If today we modify these rules, it is only to this extent: Where the defense affirmatively seeks a delay or where it consents to a delay or where it requests

government action which necessarily requires reasonable time for accomplishment, then the defense waives government speedy-trial accountability for those periods of time. Beyond that, nothing in this opinion must be construed as "707–izing" the *Burton–Driver* presumption.

8. Mil.R.Evid. 305(e) provides:

When a person subject to the code who is required to give warnings under subdivision (c) intends to question an accused or person suspected of an offense and knows or reasonably should know that counsel either has been appointed for or retained by the accused or suspect with respect to that offense, [*but see Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704 (1988)], the counsel must be notified of the intended interrogation and given a reasonable time in which to attend before the interrogation may proceed. *See also United States v. McOmber,* 1 MJ 380 (CMA 1976).

gust 4, the agent had no duty to notify anyone. Accordingly, the judge denied the defense motion to suppress the confession. Trial defense counsel persisted, however, arguing:

> The rule as I understand it is once you invoke your rights [to counsel], you cannot be questioned again *until you're given an opportunity to see counsel.*

(Emphasis added.) No legal authority for this proposition was cited, however. After further discussion, the military judge adhered to his conclusion that the only issue was Mil.R.Evid. 305(e) notice, which he deemed inapplicable. All parties (the Court of Military Review and government appellate counsel included) now agree that the military judge erred in denying the motion to suppress.[9 & 10]

Admittedly, the Supreme Court has sent somewhat mixed signals as to what is to happen after counsel has been requested. In *Miranda v. Arizona,* 384 U.S. 436, 474, 86 S.Ct. 1602, 1627, 16 L.Ed.2d 694 (1966), the Court held that, once an accused who is in custody

> states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney *and to have him present during any subsequent questioning.*

(Emphasis added.)

*Edwards v. Arizona,* 451 U.S. 477, 482, 484–85, 101 S.Ct. 1880, 1883, 1884–85, 68 L.Ed.2d 378 (1981), reiterates that "the interrogation must cease *until an attorney is present* " (emphasis added) but adds

> that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities *until counsel has been made available to him,* unless the accused himself initiates further communication, exchanges, or conversations with the police.

(Emphasis added.)

*Edwards* further cites *Rhode Island v. Innis,* 446 U.S. 291, 298, 100 S.Ct. 1682, 1688, 64 L.Ed.2d 297 (1980), for the proposition that, "where a suspect in custody had invoked his *Miranda* right to counsel," he had an " 'undisputed right' under *Miranda* to remain silent and to be free of interrogation *'until he had consulted with a lawyer.'* " 451 U.S. at 485, 101 S.Ct. at 1885 (emphasis added).

More recently, *Arizona v. Roberson,* 486 U.S. 675, 108 S.Ct. 2093, 100 L.Ed.2d 704

---

**9.** The Court of Military Review's holding is as follows:

> Once appellant requested counsel, a subsequent valid waiver of that right could not be established by merely showing he was re-advised and responded to further custodial interrogation after consulting with counsel. Appellant was subject to reinterrogation only when he either initiated further communication with investigators or received the effective assistance of counsel. The right to counsel is a prime example of those rights requiring the special protection of the knowing and intelligent waiver standard. *Edwards v. Arizona,* 451 U.S. 477, 482–485, 101 S.Ct. 1880, 1883–1885, 68 L.Ed.2d 378 (citing *Johnson v. Zerbst,* 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). The government has not met its burden of showing that appellant knowingly and intelligently waived his rights to the presence of counsel at future interrogations and the adequate assistance of counsel at any time after he initially invoked it on 8 February 1984.
>
> To the contrary, the record shows that the actions of TDS counsel, the deputy staff judge advocate at Fort Huachuca, and the CID agents, while perhaps unsuspectingly, frustrated appellant in his attempts to exercise his rights. *See United States v. Tempia,* [16 USCMA 629, 638,] 37 CMR [249,] at 258. To hold otherwise would be to sanction the actions of TDS counsel as government agents rather than representatives of appellant. The government would have us view the consultations as sufficient evidence to show waiver, when the consultations were clearly insufficient to provide the type of effective representation envisioned by *Tempia* and *Miranda* [*v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) ].

27 MJ at 668.

**10.** In issue III, appellate defense counsel also contend that trial defense counsel was ineffective in failing to move to suppress the confession based on lack of voluntariness—*i.e.,* the CID threatened him into submission. However, the indications in this record are insufficient to cause us to consider second-guessing trial defense counsel's judgment in this respect. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

(1988), quoted both the "presence" language of *Miranda, id.* 108 S.Ct. at 2097, and the "made available" language of *Edwards, id.* at 2096, 2098. In addition, in rejecting the argument "that fresh sets of *Miranda* warnings will 'reassure' a suspect who has been denied the counsel he has clearly requested that his rights have remained untrammeled," the Court reasoned:

> [T]o a suspect who has indicated his inability to cope with the pressures of custodial interrogation by requesting counsel, any further interrogation without counsel having been *provided* will surely exacerbate whatever compulsion to speak the suspect may be feeling.

108 S.Ct. at 2100.

Even today, we are not precisely clear as to whether counsel secured under the Fifth Amendment[11] must invariably be present at any reinitiation of contact or whether, once substantial legal services have been provided, there are any exceptions to the presence requirement. In *United States v. Fassler*, 29 MJ 193 (CMA 1989), a closely analogous case involving application of *Arizona v. Roberson, supra*, the accused terminated questioning by invoking counsel rights. We ruled that a "10–minute long-distance telephone conversation between Fassler and the defense counsel," concerning Fassler's apprehension and impending pretrial confinement hearing, did not satisfy the presence requirement of *Miranda.* 29 MJ at 197.

■ We reach the same result here. Whatever the requirement of *Miranda, Edwards, et al.*, we hold that the brief visitation of counsel here was insufficient to permit receipt in evidence of any confession secured by investigators upon their own initiation of contact. Thus, we agree with the reasoning of the Court of Military Review entirely in this respect. *See* n.9, *supra.* Probably, if appellant did not have such counsel that Mil.R.Evid. 305(e) was implicated, then *Miranda, Edwards, et al.*, were not satisfied. Thus, the investigators violated appellant's Fifth Amendment right

to counsel by reinitiating contact with him as they did, and the fruits of this contact were inadmissible.

### *Waiver*

The narrow question now before us then is whether, despite the military judge's error in rejecting appellant's motion to suppress, appellant's pleas of guilty could nevertheless be provident. The Court of Military Review affirmed appellant's conviction on the basis that they were. 27 MJ at 669–70. That court relied largely on Mil.R.Evid. 304(d)(5), which provides:

> Except as otherwise expressly provided in R.C.M. 910(a)(2) [conditional pleas], a plea of guilty to an offense that results in a finding of guilty waives all privileges against self-incrimination and all motions and objections under this rule with respect to that offense regardless of whether raised prior to plea.

In support of this Manual provision, the Court of Military Review noted the "well-settled law that a voluntary and intelligent plea of guilty on the advice of competent counsel waives an erroneous ruling on the admissibility of a pretrial confession." 27 MJ at 669 (emphasis added), *citing Parker v. North Carolina*, 397 U.S. 790, 90 S.Ct. 1458, 25 L.Ed.2d 785 (1970), and *McMann v. Richardson*, 397 U.S. 759, 90 S.Ct. 1441, 25 L.Ed.2d 763 (1970).

In *McMann v. Richardson, supra*, "[t]he principal issue ... [was] whether and to what extent an otherwise valid guilty plea may be impeached in collateral proceedings by assertions or proof that the plea was motivated by a prior coerced confession." 397 U.S. at 760, 90 S.Ct. at 1443. As the Court noted:

> [T]he decision to plead guilty before the evidence is in frequently involves the making of difficult judgments. All the pertinent facts normally cannot be known unless witnesses are examined and cross-examined in court. Even then the truth will often be in dispute. In the

---

**11.** At the time of appellant's confession, "adversary judicial proceedings" had not commenced. Therefore, appellant's Sixth Amendment right to

counsel had not yet attached. *See United States v. Jordan*, 29 MJ 177, 186 (CMA 1989).

face of unavoidable uncertainty, the defendant and his counsel must make their best judgment as to the weight of the State's case. Counsel must predict how the facts, as he understands them, would be viewed by a court. If proved, would those facts convince a judge or jury of the defendant's guilt? On those facts would evidence seized without a warrant be admissible? Would the trier of fact on those facts find a confession voluntary and admissible? Questions like these cannot be answered with certitude; yet a decision to plead guilty must necessarily rest upon counsel's answers, uncertain as they may be. Waiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.

That a guilty plea must be intelligently made is not a requirement that all advice offered by the defendant's lawyer withstand retrospective examination in a post-conviction hearing. Courts continue to have serious differences among themselves on the admissibility of evidence, both with respect to the proper standard by which the facts are to be judged and with respect to the application of that standard to particular facts. That this Court might hold a defendant's confession inadmissible in evidence, possibly by a divided vote, hardly justifies a conclusion that the defendant's attorney was incompetent or ineffective when he thought the admissibility of the confession sufficiently probable to advise a plea of guilty.

397 U.S. at 769–70, 90 S.Ct. at 1448–49 (citing *Brady v. United States,* 397 U.S. 742, 756–57, 90 S.Ct. 1463, 1473–74, 25 L.Ed.2d 747 (1970)).

Further, the Court observed that "[i]t is no denigration of the right to trial to hold that when the defendant waives his state court remedies and admits his guilt, ... he assumes the risk of ordinary error in either his or his attorney's assessment of the law

and facts." *Id.* 397 U.S. at 774, 90 S.Ct. at 1450.

The rule in *McMann v. Richardson, supra,* was not limited to collateral attack. In *Parker v. North Carolina, supra,* a certiorari petitioner who pleaded guilty at trial contended on appeal that the authorities had coerced his confession through various unlawful deprivations. The Court reasoned:

On the assumption that Parker's confession was inadmissible, there remains the question whether his plea, even if voluntary, was unintelligently made because his counsel mistakenly thought his confession was admissible. As we understand it, Parker's position necessarily implies that his decision to plead rested on the strength of the case against him: absent the confession, his chances of acquittal were good and he would have chosen to stand trial; but given the confession, the evidence was too strong and it was to his advantage to plead guilty and limit the possible penalty to life imprisonment. On this assumption, had Parker and his counsel thought the confession inadmissible, there would have been a plea of not guilty and a trial to a jury. But counsel apparently deemed the confession admissible and his advice to plead guilty was followed by his client. Parker now considers his confession involuntary and inadmissible. The import of this claim is that he suffered from bad advice and that had he been correctly counseled he would have gone to trial rather than enter a guilty plea. He suggests that he is entitled to plead again, a suggestion that we reject.

397 U.S. at 796–97, 90 S.Ct. at 1462 (footnote omitted).

▆ Appellant's complaint on appeal is similar. He contends that "instead of preserving the critical issue regarding the inadmissibility of appellant's confession, trial defense counsel advised appellant to plead guilty, thus causing a waiver of the constitutional infirmity." Therefore, appellant argues that he "was denied his right to sixth amendment counsel in this case." We disagree.

First, we have read this record carefully and have no misgivings about counsels' general competence or the level of preparation and effort put into this trial by them. Second, even though we agree that defense counsel underestimated their chances on appeal, we are satisfied that such misjudgment did not amount to ineffective assistance of counsel. *See Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). Counsels' hesitancy to risk a mandatory life sentence[12] was all the more understandable, given the general uncertainty at the time of trial about the meaning of *Miranda, Edwards, et al.,* and the fact that an attorney actually was provided appellant upon his request, albeit the service rendered was limited as noted.

Third, there is no doubt on this record that appellant understood that his pleas of guilty waived further contest of the admissibility of his confession. *See United States v. Johnson,* 21 MJ 211, 216 (CMA 1986) (Cox, J., concurring in the result). In addition to the ordinary warnings about the meaning and effect of a plea of guilty, the military judge made the point especially clear to appellant when he discussed the terms of the pretrial agreement. The judge pointed out that, by his conditional pleas of guilty, appellant had preserved his speedy-trial motion for appeal, whereas in the normal situation a plea of guilty waives all motions.

■ Finally, it would appear the defense made a calculated decision to forego pursuit of the suppression motion in exchange for what must have seemed to be a very favorable sentence limitation, given the gruesome facts of this case. For these reasons, we conclude that appellant's pleas of guilty waived his motion to suppress his confession.

The decision of the United States Army Court of Military Review is affirmed.

Chief Judge EVERETT concurs.

### APPENDIX

I am assigned to the Trial Defense Service in Frankfurt, Germany.

On 10 May 1984, the trial counsel, Captain Ronald Scott, asked me to see Private Donald King who was a suspect in a murder case.

I spent approximately ten minutes with Private King. We did not discuss the facts of the case. I advised Private King that he should not discuss the case with anyone.

I told Private King that I was not detailed to represent him and that I would not be representing him in this case unless he specifically asked for me. I never considered myself Private King's attorney and I did not establish an attorney-client relationship with him. No attorney-client relationship was established based on the advice of my Regional Defense Counsel who was concerned that I would be required to return to the States to defend Private King if he was tried in a court-martial.

During the course of the interview with Private King, there was no mention of him having seen another attorney in the past. I may have asked him if he had an attorney, but I don't specifically recall. If I did, the response from Private King would have been a negative one.

I have not spoken to Private King since that day nor have I seen him. I did not inform CID that I was Private King's attorney.

Captain Scott called me soon after that interview to inquire whether I was Private King's attorney. I told him that based on the advice of my Regional Defense Counsel no attorney-client relationship was established. Captain Scott did not mention to me the possibility of Private King being re-interviewed by CID.

SULLIVAN, Judge (concurring):

Executive Order 12,473, 49 Fed.Reg. 17152 (1984), is permissive in its wording concerning court-martial processes begun prior to August 1, 1984. Accordingly, I reluctantly accept the parties' agreement that RCM 707 applies in this case. *Cf.*

12. Art. 118(4), UCMJ, 10 USC § 918(4); para. 43*e*(1), Part IV, Manual for Courts–Martial,

United States, 1984.

*United States v. Facey,* 26 MJ 421, 424 (CMA 1988); *United States v. Leonard,* 21 MJ 67 (CMA 1985). Moreover, I agree with Judge Cox' resolution of appellant's speedy-trial claim under this rule.

Yet, I disagree somewhat with the method utilized by the majority opinion to resolve the *Burton–Driver* question. *See* n. 7 of the majority opinion at 66. Particularly, I do not find that this body of law should be or is modified in the present case. However, because of the conditional nature of Judge Cox' opinion on this matter, I can join him in concurrence.

Normal practice under Article 10, Uniform Code of Military Justice, 10 USC § 810, and the decision of this Court in *United States v. Burton,* 21 USCMA 112, 44 CMR 166 (1971), and its progeny is that defense-requested delay is chargeable to the defense. *See United States v. Matthews,* 16 MJ 354, 362 (CMA 1983); *United States v. Colon–Angueira,* 16 MJ 20, 22 (CMA 1983). As was said in *United States v. Cole,* 3 MJ 220, 225 (CMA 1977):

> While defense-requested delays or continuances generally are attributable to the defense as the party which benefits therefrom, a showing that the prosecution could not have proceeded any earlier at any rate compels the conclusion that the defense-requested "delay" did not in fact *delay* the proceedings at all and the responsibility for the pertinent time period remains where it started: on the shoulders of the Government.

(Footnote omitted.) There was no showing by the defense or finding by the judge in appellant's case that the Government could not have proceeded during these periods. Accordingly, I would charge these periods to appellant without modifying *Burton* or its descendants.

Otherwise, I agree with the majority opinion.